# In the United States Court of Federal Claims

No. 17-1315C
(Filed: January 22, 2019)

|  |  |
|---|---|
| _____ ) | Keywords: United States Public Health |
| | Service; Temporary Disability Retired |
| DEANNA MAE CASIANO, *et al.* ) | List; Permanent Disability Retired List; |
| ) | Medical Review Board; Medical Appeals |
| Plaintiffs, ) | Board; Disability Evaluation Manual; |
| ) | Military Pay Act; 10 U.S.C. § 1201; 42 |
| v. ) | U.S.C. § 213a |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |

*Jason E. Perry*, Law Office of Jason Perry, LLC, Wellington, FL, for Plaintiffs.

*William J. Grimaldi*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Reginald T. Blades, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, J.**

The individual Plaintiffs in this case are Deanna Casiano and Patricia Barrett, each of whom formerly served as a commissioned officer in the United States Public Health Service ("USPHS" or "PHS"). Both Ms. Casiano and Ms. Barrett were separated from the USPHS after being found unfit to perform their duties for medical reasons. Each claims that the USPHS violated applicable laws and regulations in determining her fitness for duty and rating her unfitting conditions. They each seek additional disability pay and benefits, as well as pay and travel allowances they allege they were wrongfully denied.

Ms. Casiano and Ms. Barrett styled their complaint as a class action on behalf of all former members of the USPHS Commissioned Corps whose disability retirement claims were considered under policies and procedures that were allegedly "not in compliance with federal law and relevant regulations" and who have "[a]s a result . . . been denied proper consideration and rating of their disabilities and have been denied important rights guaranteed them under the law." Compl. at 1, ECF No. 1. Plaintiffs, however, did not file a formal motion for class

certification, and ultimately agreed that the Court should address the parties' cross-motions for judgment on the administrative record before considering whether the case should be certified as a class action. See Pls.' Reply to Def.'s Resp. to Pls.' Cross-Mot. ("Pls.' Reply") at 3, ECF No. 32.

Currently before the Court are the government's motion to dismiss and for judgment on the administrative record (ECF No. 12), as well as plaintiffs' cross-motion for judgment on the administrative record (ECF No. 25). For the reasons set forth below, the government's motion to dismiss is **DENIED**. Further, and as also explained in greater detail below, Plaintiffs' cross-motion for judgment on the administrative record as to Ms. Casiano's challenge to her disability rating is **GRANTED** and her claim is remanded to the Board for Correction of Commissioned Corps Records ("BCCCR") for further proceedings consistent with this opinion. The government's motion for judgment on the administrative record as to Ms. Barrett's claims is **GRANTED**.

## BACKGROUND

### I.  Legal Framework

#### A.  Relevant Statutory Provisions

The USPHS Commissioned Corps is one of the seven uniformed services. See 10 U.S.C. § 101(a)(5)(C).[1] It "employs approximately 6,000 officers in a variety of medical health professions; those officers administer programs designed to promote public health, prevent disease, and advance public health science." Middlebrooks v. Leavitt, 525 F.3d 341, 343 (4th Cir. 2008); see also Brooks v. United States, 65 Fed. Cl. 135, 136 (2005) (describing the history of the Commissioned Corps). The Assistant Secretary for Health administers the Commissioned Corps under the direction of the Secretary of Health and Human Services ("HHS"). 42 U.S.C. § 202.

By statute, "[c]ommissioned officers of the [USPHS] or their surviving beneficiaries are entitled to all the rights, benefits, privileges, and immunities . . . provided for commissioned officers of the Army or their surviving beneficiaries under [enumerated] provisions of title 10." 42 U.S.C. § 213a(a). Pertinent to this case, the referenced provisions of Title 10 include Chapter 61, which covers retirement or separation of military servicemembers based on physical disability. 42 U.S.C. § 213a(a)(2); 10 U.S.C. §§ 1201–1222.

Section 1201(a) of Title 10 provides that "[u]pon a determination by the Secretary concerned that [an eligible servicemember] is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay . . . the Secretary may retire the member, with retired pay." 10 U.S.C. § 1201(a). Under the statute, a member is eligible for retirement where the disability she incurred is permanent and she 1) has

---

[1] The other six uniformed services are the U.S. Army, U.S. Navy, U.S. Air Force, U.S. Marine Corps, U.S. Coast Guard, and the Commissioned Corps of the National Oceanic and Atmospheric Administration. 10 U.S.C. § 101(a)(4) and (5).

twenty years of service or 2) her disability is rated at least 30% under the Department of Veterans' Affairs ("the VA") disability rating system. 10 U.S.C § 1201(b)(1), (b)(3). If a member has less than twenty years of service and a disability that is rated lower than 30%, then she may be separated from the service with severance pay only. 10 U.S.C. § 1203(a).

The HHS Secretary administers Chapter 61 for USPHS commissioned officers. Thus, Title 42 provides that "[t]he authority vested by title 10 in the 'military departments', 'the Secretary concerned', or 'the Secretary of Defense' with respect to the rights, privileges, immunities, and benefits referred to in subsection (a) shall be exercised, with respect to commissioned officers of the Service, by the Secretary of Health and Human Services or his designee." 42 U.S.C. § 213a(b); see also 42 U.S.C. § 216(a) (giving the President the authority to "prescribe regulations with respect to the . . . retirement. . . . of the commissioned corps of the Service"); Exec. Order No. 11,140, 29 Fed. Reg. 1,637 (Jan. 30, 1964) (delegating the President's rulemaking authority under § 216(a) to the Secretary of HHS).

## B. Regulations and Guidance

In accordance with his statutory and other authority, the HHS Secretary has promulgated rules and directives regarding the administration of the disability retirement program for commissioned officers of the USPHS. A summary of the relevant administrative rules and guidance is set forth below.

### 1. The Disability Evaluation Manual

The Disability Evaluation Manual for the Commissioned Corps ("the Manual" or "the DEM") "prescribe[s] the administrative procedures and policies to be followed in implementing the provisions of Title 10, United States Code, Chapter 61, pertaining to separation or retirement of commissioned officers of the Public Health Service (PHS) because of physical disability." Def.'s App. to Def.'s Mot. to Dismiss ("Def. App.") at 6, ECF No. 12-1. The DEM provides that "to be eligible for disability retirement or separation, an officer must be found unfit to perform the duties of his/her grade, category or office because of one or more physical or mental conditions." Id. at 8. It further states that "upon determining that an officer is eligible for disability benefits, the disability must be rated using the VA Schedule for Rating Disabilities (VASRD) as modified by DoD Directive 1332.18." Id. at 9. It emphasizes, however, that "although a medical condition is ratable according to the VASRD, it does not necessarily constitute a disability for which PHS retirement or separation disability benefits will be granted." Id.

The DEM provides that "upon receipt of a request for a fitness evaluation from the officer, the officer's program official, or at the initiative of the Director, DCP, the Chief MAB, DCP, will arrange for the complete medical examination of the officer at an appropriate medical facility." Id. at 13.[2] The medical examination "cover[s] all diseases or injuries or residual

---

[2] The Director, DCP, is the Director, Division of Commissioned Personnel, Human Resources Service, Program Support Center, HHS. He or she has been delegated the authority to appoint

conditions which may be pertinent in determining the ability of the officer to perform his/her duties and enable PHS MRB [("Medical Review Board")] to rate the officer's disability." Id. Required examinations include a general medical examination and special medical examinations for specific conditions that may be significant to the determination of fitness. Id. at 13–14. Upon completion of the examination, the Chief MAB, DCP is to be provided a "narrative summary capsulizing the pertinent medical findings; SF-88 and SF-93, if completed; and reports of consultations, x-rays, biopsies, and other special tests as appropriate." Id. at 14. He in turn must supply this material to the MRB. Id. at 15.

"When PHS MRB is satisfied that sufficient information is available for rendering accurate and just findings" it makes its fitness determination. Id. at 16. If it makes a finding of unfitness, then it must determine whether the condition was incurred in the line of duty and, "[i]f PHS MRB finds an officer eligible for disability benefits, the rating for each compensable disability must be determined from VASRD as modified by DoD Directive 1332.18." Id. at 18. As noted above, in accordance with 10 U.S.C. § 1203:

> "[i]f the officer is otherwise eligible for disability benefits but has less than 20 years of creditable service for retirement purposes and the combined percentage of disability is less than 30%, he/she must be separated with severance pay. If the officer has at least 20 years of service for retirement purposes or the percentage is 30% or more, he/she must be retired."

Id.

The DEM sets forth the criteria for a permanent or temporary disability retirement. Id. at 19. A permanent disability is defined as either "a defect [that] has stabilized so that the compensable percentage rating is not expected to change during the next 5 years" or a defect with a rating of "80% or more . . . [that] will probably not improve so as to be ratable at less than 80% during the next 5 years." Id. at 19. If the officer's condition may improve, the officer may be placed on the temporary disability retired list ("TDRL"). Id. In that case, the MRB will review periodic medical examinations to assess whether the officer may be returned to duty or permanently retired. Id. at 20.

Finally, the DEM explains the relationship between the adjudication of medical disability retirement cases for USPHS commissioned officers and Department of Defense ("DoD") Directive 1332.18, which governs the Disability Evaluation System that controls such determinations for the military departments, including the U.S. Army. See Pls.' App. to Pls.' Consolidated Resp. to Def.'s Mot. to Dismiss, Opp'n to Class Certification, for J. on the Admin. R. & Cross-Mot. for J. on the Admin. R. ("Pls.' App.") at 43–173, ECF No. 25-1. It states that "to assure uniform interpretation of the laws among the Uniformed Services, PHS has adopted the principles set forth in the DoD Directive 1332-18." Def. App. at 7. The DEM cautions, however, that "the administrative procedures used to implement these guidelines may be at variance due to differences in PHS and DoD operational practices." Id. Further, according to the

---

members to the medical review boards. Def. App. at 21. The Chief MAB, DCP, is the Chief of the Medical Affairs Branch, Division of Commissioned Personnel.

Manual, "[w]here there is a discrepancy between the provisions of any official PHS issuance and DoD Directive 1332.18, the PHS issuance shall in all cases prevail." Id.

## 2.   Personnel Instruction 1 (Medical Review Boards)

Personnel Instruction 1, Chapter CC 49, Subchapter CC49.3 of the USPHS Personnel Manual, "prescribe[s] the procedures for establishing Medical Review Boards and Medical Appeals Boards and the powers and duties of such boards." Id. at 1. MRBs are composed of three senior grade officers, at least one of whom must be a medical officer. Id. at 2. They are appointed to "review the case of any officer who may be entitled to retirement due to physical disability" and "[in] the case of any officer, who, after his appointment in the regular corps, or call to active duty in the reserve corps, is required to undergo a physical examination, the results of which indicate a possible physical disqualification for further service." Id.

Medical Appeals Boards ("MABs"), are composed of three or more medical officers "who did not perform the Medical Review Board staffing function, nor serve as a member of the Medical Review Board." Id. MABs "provide the officer with a full and fair hearing in accordance with guidelines published in [the DEM]." Id.

Under Personnel Instruction 1, "[a] board may require an officer whose case has been referred to the board to undergo such further physical examination as it may direct," as well as "to appear before the board to answer any questions, or produce any documents pertinent to his/her health history or the officer's activities at the time when the alleged disability arose or was aggravated." Id. at 3. The Board must report its findings and recommendations to the Surgeon General for determination. Id.

## 3.   Personnel Instruction 7 (Medical Appeals Board)

Personnel Instruction 7, Chapter CC 23, subchapter CC23.8 of the USPHS Personnel Manual "sets forth the mechanisms and guidelines by which an officer who wishes to appeal the findings of a Commissioned Corps Medical Review Board, with respect to disability retirement, disability separation, or retention on active duty may obtain a timely decision." Id. at 33. In accordance with the Instruction, an officer may appeal the findings and recommendation of the MRB to the MAB by filing a written statement of appeal within thirty days. Id. Once the statement is filed and the thirty-day period within which an appeal may be withdrawn elapses, "the findings and recommendations of the MRB are null and void, do not establish a minimum threshold, and are not binding on the Board. . . . At this point, no retraction is permitted; the case must be reviewed by the Board and only its decisions will be considered by the [Surgeon General]." Id.[3]

---

[3] Personnel Instruction 7 states that the MAB's decision will be reviewed by the Director of the Program Support Center ("PSC") who will make the final determination. Def. App. at 33. That responsibility was transferred to the Surgeon General in 2012. See 77 Fed. Reg. 60,996–104 (Oct. 5, 2012); 77 Fed. Reg. 30,005 (May 21, 2012).

Personnel Instruction 7 provides that an officer pursuing an appeal may be represented by counsel, at his or her own expense. Id. at 43. It also authorizes a hearing at which the officer has the right to present evidence and witnesses. Id. at 43–44, 46–47. After the hearing, the Board members are to consider the record and all information obtained during the hearing and, based on the applicable provision of Title 10, Chapter 61, make a recommendation to the Surgeon General whether the appellant should be retained on active duty, retired for disability, or separated from the Service. Id. at 47. The officer has no right to respond to the Board's recommendation before a final decision is made by the Surgeon General. Id. at 48.

## II.  Ms. Casiano's Claims

### A.  Background

Ms. Casiano became a member of the USPHS Commissioned Corps on August 12, 2003. Corrected Admin. R. ("AR") 1, ECF No. 17. She served most recently as a nurse consultant detailed to the Indian Health Service until she was medically separated on December 31, 2015 at the rank of Commander. AR 201.

In 2014, Ms. Casiano was referred to the MRB for a fitness-for-duty evaluation after she submitted a request for more than ninety days of consecutive sick leave. AR 4. The referral was based on section 6-4 of the Commissioned Corps sick leave policy, CC 363.01, which states in pertinent part that "[i]f an officer is absent from duty because of illness, injury or postpartum convalescence for a period of more than 90 consecutive days . . . the personnel or other pertinent files of such officer will be referred to MAB for a mandatory fitness-for-duty evaluation." Id.; see also Def. App. at 11 (DEM, Ch.3(A)(3)(a)).[4]

The MRB's report, issued on December 19, 2014, AR 3, was based on Ms. Casiano's medical records as well as her fifteen-page statement detailing her medical history and then-current complaints. See AR 22–150 (medical records); AR 152–166 (personal statement). The MRB found Ms. Casiano "not fit for duty based on her rank, category and office." AR 3. It identified "fibromyalgia" (VASRD Diagnostic Code 5025) as Ms. Casiano's unfitting condition, to which it assigned a 20% disability rating. Id. Because this rating was not high enough for placement on a disability retirement list, the MRB stated that it "was resigned to the final recommendation of medical separation of the officer from the Corps." Id.

Ms. Casiano appealed the MRB's determination to the MAB. See AR 190. On June 15, 2015, at the request of Ms. Casiano's attorney, the MAB held a hearing. Id. The MAB heard testimony from Ms. Casiano and received additional medical records from her attorney, including evaluations recorded by her medical providers on VA Disability Benefits Questionnaire forms. AR 300–02. It also had before it two recent reports prepared by physicians on Elmendorf Air Force Base's Medical Evaluation Board. One of the reports was from Internal

---

[4] The condition that precipitated Ms. Casiano's sick leave was "a 2-year (or longer) history of an 'undifferentiated connective tissue disease,' and inflammatory condition manifested as diffuse musculo-skeletal pain (hands, feet, ankles, shoulders, back and headache)." AR 4.

Medicine (completed June 4, 2015), AR 309–15, and the other from Mental Health (undated but likely completed in May or June 2015), AR 303–08.

In a "Full and Fair Hearing Appeals Board Report," signed on June 19, 2015, the MAB "unanimously deemed [Ms. Casiano] not fit for duty based on her rank, category and office." AR 199. It "expressed confusion regarding [Ms. Casiano's] emphasis of the pain in her feet predominating as her impairment, versus the comprehensive summary by rheumatology and the internal medicine MEB Report, both of which emphasized fibromyalgia as the disability." Id. It also declared itself "perplexed" by the diagnosis of fibromyalgia "despite the officer's emphasis of painful impairments in her hands and feet (rather than soft-tissue trigger points)," and because "her pains were resolved with corticosteroids and/or immuno-modulators (rather than exercise and anti-depressants)." Id. The MAB noted that during her recommended sick leave, Ms. Casiano had earned a Masters Degree in Nursing, which it believed "conflicted with her testimony (and the mental health MEB report) of experiencing mild cognitive impairment." Id. It noted that, based on the clinical records in determining the degree of disability, the Board believed that Ms. Casiano's anxiety disorder "was part of the constellation of symptoms that comprised fibromyalgia." AR 200. It also noted that her anxiety disorder was controlled with a low daily dose of Xanax, along with counseling. Id.

The MAB stated that it intended to incorporate her anxiety disorder into the rating for her fibromyalgia and assigned her a disability rating of 20%. Id. Because the rating was less than 30%, the MAB, like the MRB before it, recommended Ms. Casiano's medical separation and not her medical retirement. Id. That recommendation was approved by the Surgeon General on October 29, 2015. AR 192.

**B.   This Action**

As noted, Ms. Casiano was separated from the Service on December 31, 2015. She received severance pay in the amount of $212,291.60. AR 201. She did not opt to apply for a correction of her records with the BCCCR. Instead, on January 26, 2018 she, along with Ms. Barrett, filed the instant class action complaint.

Ms. Casiano's individual allegations are set forth at ¶¶ 76–106 of the complaint and in Plaintiffs' response brief. Pls.' Consolidated Resp. to Def.'s Mot. to Dismiss, Opp'n to Class Certification, for J. on the Admin. R. & Cross-Mot for J. on the Admin. R. ("Pls.' Mot."), ECF No. 25. Her primary claim is that the MAB erred in assigning her a 20% disability rating. She contends that she should have received a 40% disability rating for her fibromyalgia under DC 5025 because her condition was "constant and refractory to treatment." Compl. ¶ 104. In addition, Ms. Casiano alleges that she should have been given a separate disability rating of 30% based on her Generalized Anxiety Disorder and a separate 20% rating for her bilateral foot condition. Id. These individualized ratings would have resulted in a combined scheduled rating of 70% according to Ms. Casiano. Id.

Ms. Casiano also claims that—allegedly in violation of 42 U.S.C. § 213a—USPHS failed to afford her certain procedural rights that are afforded to Army officers who are undergoing an evaluation of their eligibility for medical separation or retirement in accordance with DoD Directive 1332.18 and the Army's implementing issuances. She characterizes the entitlements

that she was allegedly denied as including, among others, "rights to an impartial review and the right to rebut the findings of [the medical evaluation] board," id. ¶ 80; "an opportunity to see the findings [of the MAB] before the final decision of the USPHS or to appeal or rebut the findings before they were finalized," id. at ¶ 105; and the right to have counsel supplied to her free of charge, id. at ¶ 106. She also complains that USPHS did not follow its own regulations when it failed to refer her for a medical examination before the MRB conducted its evaluation, as is required by the USPHS DEM. Id. at ¶ 80. Finally, Ms. Casiano alleges that she was unlawfully denied reimbursement for the costs of travel to attend mandatory medical examinations and to appear at her MAB hearing. Id. at ¶ 106.

## III.  Ms. Barrett's Claim

### A.  Background

As noted, the other individual plaintiff in this case is Patricia Barrett. She served in the USPHS Commissioned Corps from May 3, 1999, AR 207, until she was placed on the TDRL effective August 1, 2011, AR 210. She was ultimately separated from the service for medical reasons effective August 1, 2016. AR 288. At the time of her separation, she had attained the rank of Captain. AR 208.

Ms. Barrett's first disability evaluation was initiated at the request of her "duty station" (the Centers for Medicare & Medicaid) on September 10, 2010. AR 213. A Medical Evaluation Board examined Ms. Barrett at a military facility and reported that she had chronic joint pains and osteoarthritis that severely limited her mobility and interfered with her ability to perform the duties of her position. AR 214–15.

Thereafter, on February 4, 2011, the USPHS MRB convened and found that Ms. Barrett's disabilities rendered her unfit for service. AR 3055. The Board recommended placing her on the Permanent Disability Retirement List ("PDRL") with ratings for unfitness "in accordance with the VA Schedule for Rating Disabilities and DoD 1332.39" of 10% for bilateral flat feet and 20% for degenerative joint disease of both knees. AR 215–16.[5]

On April 21, 2011, and May 18, 2011, Ms. Barrett submitted objections to the MRB's findings, and requested an MAB/Full and Fair Hearing. AR 216. The MAB convened on June 22, 2011. AR 218. It agreed with the MRB that Ms. Barrett was unfit for duty and that the unfitting conditions were flat feet and degenerative joint disease of both knees. Id. The MAB disagreed, however, with the MRB's conclusion that her prognosis was poor. Id. The MAB noted that her left foot had improved since her most recent surgery, and that her right-foot surgery was pending. Id. It recommended placing Ms. Barrett on the TDRL for eighteen months, rather than placing her on the PDRL, as the MRB had recommended. AR 219. The MAB assigned her ratings for unfitness "in accordance with the VA Schedule for Rating Disabilities and DoD

---

[5] Plaintiffs contend, and the government does not deny, that DoDI 1332.39 was rescinded via another DoD memorandum on October 14, 2008. See Compl. ¶ 60. USPHS has not updated its instructions to remove references to the now-rescinded DoD Directive.

1332.39" at 30% for bilateral flat feet and at 20% for degenerative joint disease of both knees, leading to a total final rating of 40%. Id.

Two years later, on July 9, 2013, the USPHS convened another MRB. AR 225. The MRB found that Ms. Barrett was subject to the same unfitting conditions, but concluded that her bilateral flat feet had improved to the point that the assigned disability rating for that condition was 0%. It again rated her degenerative joint disease of the knees (DC 5003) at 20%. Id. Therefore, Ms. Barrett could not be recommended for disability retirement but instead was recommended for medical separation with severance pay. Id.

Ms. Barrett disagreed with the findings of the MRB and requested a formal hearing on August 23, 2013. AR 265. The MAB held a hearing on December 4, 2013. Id. In its report, issued on December 26, 2013, the MAB stated that it had reviewed all the data Ms. Barrett had provided. It observed, however, that there was a paucity of medical records before it and no statements from her specialists. AR 267. The Board considered Ms. Barrett's testimony that her left hip had significantly improved after a total-left-knee arthroplasty was performed in October of 2013. Id. It noted her testimony that she was planning a right-knee arthroplasty which she believed would permit her to exercise, lose weight, and perhaps return to duty. Id. The Board recommended continuing her on TDRL for an additional eighteen months, after which it would again review her case. Id.

The next review of Ms. Barrett's case was initiated after she contacted the USPHS Medical Affairs Team in an email dated September 17, 2015. AR 272. In the email, she advised Medical Affairs that she was planning to have total-right-knee replacement on September 21, 2015 and she requested guidance regarding her pending next TDRL review by the MRB. Id. Medical Affairs provided her with an email that same day which included instructions excerpted from the MAB's December 2013 Report. Id. She asked that Medical Affairs formally request that she be evaluated at a military treatment facility but received no response. AR 272–73. On July 6, 2016, she again contacted Medical Evaluations Section staff asking for an update, noting that her five-year anniversary on the TDRL list was coming up and that she was requesting to be permanently retired. AR 273.[6]

Medical Affairs immediately responded to Ms. Barrett's email. It affirmed that the TDRL period was about to end, and that the review of her case would need to be expedited so that it could be completed by August 1, 2016. Id.

---

[6] At the time, 10 U.S.C. § 1210 required the "Secretary concerned" to "make a final determination of the case of each member whose name is on the temporary disability retired list upon the expiration of five years after the date when the member's name was placed on that list." It further stated that "[i]f, at the time of that determination, the physical disability for which the member's name was carried on the temporary disability retired list still exists, it shall be considered to be of a permanent nature and stable." The statute was later amended to require a final determination within three rather than five years. 10 U.S.C. § 1210 (as amended by Pub. L. No. 114-328, § 525, 130 Stat. 2000, 2117 (2016)).

An MRB was convened on July 26, 2016. The MRB reviewed her case based on the medical records she had provided. AR 269. The MRB found that Ms. Barrett remained unfit for duty. It recommended converting her from the TDRL to the PDRL. AR 270. The Board rated her disabilities at a 30% level for bilateral flat feet, and at a 20% level for "Degenerative Joint Disease of Both Knees." Id. It assigned a final combined rating of 40%. Id.

On August 1, 2016, believing that her disabilities had actually worsened, and dissatisfied with the 40% disability rating the MRB had assigned, Ms. Barrett requested an MAB hearing. Compl. ¶ 123. That hearing was convened on August 16, 2016. AR 281. After review of all the medical records Ms. Barrett had submitted, as well as her Statement of Appeal and testimony, the Board unanimously agreed that she remained not fit for duty. AR 286. It concluded, however, that her bilateral flat feet and bilateral degenerative joint disease of the knees had both improved as a result of the surgeries that she had undergone. Id. It rated each disability at 10%, for a combined rating of 20%. AR 283.[7]

Because it had rated her unfitting conditions below the 30% threshold for entitlement to a disability retirement, the MAB recommended Ms. Barrett for medical separation with severance pay. The Surgeon General signed his approval of the findings of the MAB and the recommendation of the Chief, Medical Affairs Branch, on November 10, 2016. AR 284, 287.

### B.  **This Action**

In the complaint filed with this Court, Ms. Barrett alleges that the decision of the USPHS to separate her with severance pay "was arbitrary and capricious, contrary to law and regulation, was not based on substantial evidence, and denied her pay and allowances that she is due as a result of her service." Compl. ¶ 137. As had Ms. Casiano, Ms. Barrett complains that the USPHS did not afford her the procedural rights afforded to Army officers under DoD Directive 1332.18 and the Army's implementing issuances. Id. ¶¶ 126, 136. She further complains that "[t]he USPHS's actions also denied her payments associated with her case, including travel pay for appearing at medical examinations and her hearing and costs for out of pocket payments incurred for private legal counsel." Id. ¶ 137.

Finally, Ms. Barrett contends that the rating assigned to her unfitting condition (degenerative joint disease) was erroneous. Plaintiffs observe that Ms. Barrett had "bilateral knee replacement surgery" and that under the VASRD, the minimum rating for a prosthetic knee is 30%. Pls.' Mot. at 24 (citing 38 C.F.R. § 4.71a, Diagnostic Code 5055). Thus, according to Plaintiffs, Ms. Barrett should have been rated at 60% for her knees. Id.[8]

---

[7] The assigned ratings are contained at page three of the MAB's Full and Fair Hearing Report. AR 287. The page three supplied with the administrative record is a very poor copy and almost illegible. Id. The Court has therefore relied in part on the Decision Memo that the MAB provided to the Surgeon General, which summarized the record and the MAB's conclusions. AR 281–84.

[8] In her complaint, Ms. Barrett alleges that USPHS violated its own rules by not providing her with medical examinations in anticipation of any of her MRBs. Compl. ¶¶ 112, 119, 121, 128.

## IV. Prior Proceedings

The government filed its motion to dismiss (ECF No. 12) and the administrative record (ECF No. 13) on January 26, 2018. A corrected administrative record was provided to the Court on CD-rom on March 12, 2018. See ECF No. 17. The Plaintiffs filed their response to the government's motion and their own cross-motion for judgment on the administrative record on May 3, 2018. ECF No. 25. The motions are now fully briefed. See ECF Nos. 29, 32.

On September 13, 2018, the Court issued an order directing the government to provide citations to, or otherwise supply copies of, the Medical Evaluation Board reports relating to the Internal Medicine and Mental Health assessments of Ms. Casiano. ECF No. 35. The government did so on September 17, 2018. ECF No. 36.

Oral argument was held on September 21, 2018. That same day, the Court ordered the parties to file supplemental briefs addressing: 1) whether Ms. Casiano's argument that the government erred by not separately evaluating and rating each joint affected was consistent with 38 C.F.R. § 4.14; 2) the appropriate standard for determining whether symptoms of fibromyalgia are "refractory to therapy"; and 3) whether the MAB provided an adequate explanation for its decision to assign a 20% rating to Ms. Casiano's fibromyalgia. ECF No. 37. The parties filed their respective briefs on October 22 and 23, 2018. ECF Nos. 40–41. The motions are now ripe for review.

## DISCUSSION

## I.  Jurisdiction

### A.  <u>The Tucker Act and the Military Pay Act</u>

Under the Tucker Act, the Court of Federal Claims has jurisdiction to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). While the Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983), it does not confer any substantive rights on a plaintiff, <u>United States v. Testan</u>, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision. <u>Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.</u>, 525 F.3d 1299, 1306 (Fed. Cir. 2008).

It is well established that Section 1201 of Title 10 of the United States Code—which governs military disability retirement and is applicable to USPHS commissioned officers by virtue of 42 U.S.C. § 213a(a)—is a money-mandating statute. <u>Fisher v. United States</u>, 402 F.3d 1167, 1174 (Fed. Cir. 2005) (citing <u>Sawyer v. United States</u>, 930 F.2d 1577 (Fed. Cir. 1991)).

_____

Plaintiffs, however, do not pursue this point in their motion for judgment on the administrative record.

Accordingly, this Court has jurisdiction over Plaintiffs' claims seeking monetary relief based on the Military Pay Act.

## II.  The Government's Motion to Dismiss

The government has moved to dismiss Plaintiffs' claims on several jurisdictional grounds. First, it seeks to dismiss Plaintiffs' claim that USPHS's administrative process for adjudicating disability cases violates 42 U.S.C. § 213a(a) because it does not guarantee the same rights provided in the Army's regulations. The government characterizes this claim as a "challenge to the Secretary of HHS's discretion to determine the fitness of PHS CC officers, which the United States Court of Appeals for the Federal Circuit precedent holds is non-justiciable." Def.'s Mot. to Dismiss, Mot. for J. on the Admin. R., & Opp'n to Class Certification ("Def.'s Mot.") at 2, ECF No. 12.

Contrary to the government's argument, however, the court of appeals "has consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy." Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995). Thus, "[a] court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion." Murphy v. United States, 993 F.2d 871, 873 (Fed. Cir. 1993); see also Dodson v. United States, 988 F.2d 1199, 1207 n.7 (Fed. Cir. 1993) (reviewing the procedural regularity of the challenged action, but not the substance of the Army's decision); Sargisson v. United States, 913 F.2d 918, 921 (Fed. Cir. 1990) (Although the "statute does not place any procedural or substantive limitations on the Secretary's discretion[,] . . . once the Secretary promulgated regulations and instructions and made them the basis for [the challenged decision], his action became subject to judicial review for compliance with those regulations and instructions.").

In this case, as noted, it is Plaintiffs' contention that USPHS is required by statute to afford them procedural rights and benefits that replicate those afforded to commissioned Army officers who undergo processing for disability retirement. They further contend that USPHS did not afford them such procedural rights in the context of adjudicating their entitlement to disability retirement. Resolving these claims involves a determination as to whether USPHS complied with what Plaintiffs claim are legal restrictions on its discretion, a matter that is clearly justiciable.

The government raises a second jurisdictional argument: because Plaintiffs contend that the rules that HHS has promulgated are inconsistent with law, their claims arise under the Administrative Procedure Act and thus are beyond this Court's jurisdiction. Def.'s Mot. at 21 (citing Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003)). This argument is similarly unpersuasive. As noted above, it is well established that, in military pay cases, servicemembers may challenge the government's decision to deny them disability retirement benefits on grounds of procedural error. See Frey v. United States, 112 Fed. Cl. 337, 347–48 (2013) (determining that plaintiff was entitled to relief where he showed that failure to follow procedures mandated under disability evaluation system led to a board decision that did not rest on complete information). Plaintiffs, therefore, may raise in this court allegations that the procedures USPHS employed did not comply with statutory requirements.

Of course, that does not mean that this Court has the authority to afford Plaintiffs the kind of broad equitable relief requested in their complaint—i.e., an order "enjoin[ing] the USPHS from its unlawful practices described in th[e] complaint." Compl. at 63. This Court has limited authority to order injunctive relief; it may do so only where such relief is "an incident of and collateral to" a money judgment. James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998). Thus, to the extent that the Court were to find that Plaintiffs' procedural rights were violated, and that such violations were prejudicial, it is empowered only to award them monetary relief; it cannot enjoin USPHS from applying the regulations prospectively.

In short, the government's jurisdictional challenges to Plaintiffs' complaint lack merit. The Court now turns to the merits of the parties' cross-motions for judgment on the administrative record.

## III. Motions for Judgment on the Administrative Record

The standard for deciding a motion for judgment on the administrative record differs from that for a motion for summary judgment. See RCFC 52.1(c); Bannum, Inc. v. United States, 404 F.3d 1346, 1354–55 (Fed. Cir. 2005). Unlike summary judgment, for instance, "a genuine dispute of material fact does not preclude a judgment on the administrative record." Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 751 (2012) (citing Bannum, 404 F.3d at 1355–56). To the contrary, "[t]o review a motion or cross-motions under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 630 (2014) (citing Bannum, 404 F.3d at 1356–57); see also RCFC 52.1 rules committee note to 2006 adoption) ("Summary judgment standards are not pertinent to judicial review upon an administrative record."). "The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding." CRAssociates., Inc. v. United States, 102 Fed. Cl. 698, 710 (2011) (citing Bannum, 404 F.3d at 1356).

### A. Plaintiffs' Claim That USPHS's Disability Evaluation System Violates the Requirements of 42 U.S.C. § 213a

As noted above, Plaintiffs allege that the USPHS scheme for adjudicating medical retirement cases violates 42 U.S.C. § 213a(a)(2). That provision states that "Commissioned officers of the Service . . . are entitled to all the rights, benefits, privileges, and immunities now or hereafter provided for commissioned officers of the Army . . . under [enumerated] provisions of title 10." The enumerated provisions include, with exceptions not relevant here, "Chapter 61, Retirement or Separation for Physical Disability." Id.

According to Plaintiffs, the language of 42 U.S.C. § 213a(a)(2) "means that the USPHS must accord its officers the same regulatory rights and benefit[s] given to Army officers under the [DoD] disability evaluation system." Pls.' Reply at 4. The DOD "Disability Evaluation System" ("DES") is established by DoDI 1332.18. Under the DES, fitness-for-duty and retirement determinations are adjudicated by Medical and Physical Evaluation Boards (MEBs and PEBs) whose composition, qualifications, and procedures are specified in DoDI 1332.18 and differ in some respects from the USPHS Medical Review and Medical Appeals Boards. In the

alternative, Plaintiffs contend, the USPHS's administrative procedures are unlawful because they are inconsistent with certain statutory rights that are guaranteed under the provisions of Title 10, Chapter 61 that are enumerated in 42 U.S.C. § 213a(a)(2).

For the reasons set forth below, the Court finds both of these arguments unpersuasive.

> **1. 42 U.S.C. § 213a(a)(2) Does Not Require USPHS To Adopt Administrative Procedures That Mirror Those Provided to Commissioned Army Officers**

First, the Court rejects Plaintiffs' argument that under 42 U.S.C. § 213a(a)(2) the USPHS was required to replicate the administrative procedures that DoD and the Army employ for making disability retirement decisions under DoDI 1332.18 and implementing Army issuances. Thus, § 213a(a)(2) states that USPHS commissioned officers are entitled to the "rights, benefits, privileges, and immunities" that are provided to commissioned officers of the Army "under . . . Chapter 61 of title 10" (emphasis supplied). The plain meaning of this language is that USPHS officers will be afforded the same <u>statutory</u> rights and benefits as are enjoyed by Army officers; the provision simply does not speak to the administrative procedures that will be used to adjudicate those statutory rights and benefits.

Indeed, 42 U.S.C. § 213a envisions that the HHS Secretary will have full authority to craft for USPHS its own administrative scheme to ensure that its commissioned officers are afforded the rights and benefits that Army officers enjoy under the enumerated statutory provisions. Subsection (b) of 42 U.S.C. § 213a states that "[t]he authority vested by title 10 in the 'military departments', 'the Secretary concerned', or 'the Secretary of Defense' with respect to the rights, privileges, immunities, and benefits referred to in subsection (a) shall be exercised, with respect to commissioned officers of the Service, by the Secretary of Health and Human Services or his designee." 42 U.S.C. § 213a(b). Thus, like the Secretaries of Defense and of the individual military services, the HHS Secretary is given the authority to "prescribe regulations to carry out [Chapter 61] within his department," and, with exceptions not relevant here:

> all powers, functions, and duties incident to the determination under [Chapter 61] of (1) the fitness for active duty of any member of an armed force under his jurisdiction; (2) the percentage of disability of any such member at the time of his separation from active duty; (3) the suitability of any member for reappointment, reenlistment, or reentry upon active duty in an armed force under his jurisdiction; and (4) the entitlement to, and payment of, disability severance pay to any member of an armed force under his jurisdiction.

10 U.S.C. § 1216(a)–(b).

Plaintiffs' argument that Congress intended to cabin the discretion of the HHS Secretary with respect to the procedures he would adopt for administering the disability retirement program for USPHS commissioned officers is inconsistent with this language. Thus, under Plaintiffs' reading, the statute subordinates to the Secretary of DoD and the Secretary of the Army, the HHS Secretary's exercise of administrative discretion with respect to the USPHS commissioned officers who serve under him. But 42 U.S.C. § 213a(b) places the HHS Secretary

on an equal footing with the DoD Secretary and the heads of the other uniformed services with respect to the administration of Chapter 61. And the delegation of authority to HHS in 42 U.S.C. § 213a(b) imposes no restrictions on the HHS Secretary other than those imposed by statute. The Court therefore rejects Plaintiffs' claims that the procedures used to adjudicate their fitness for duty and/or eligibility for disability retirement were invalid under 42 U.S.C. § 213a(a)(2) to the extent that they did not mirror the procedures applicable to commissioned Army officers.[9]

## 2. The Procedures Adopted by USPHS Did Not Violate the Plaintiffs' Statutory Rights

In addition to complaining that the USPHS's administrative procedures are unlawful because they do not mirror those provided under DoD regulations, Plaintiffs argue that they were denied <u>statutory</u> rights provided to Army officers under Chapter 61. This contention also lacks merit.

Thus, Plaintiffs claim that the system that the HHS Secretary has established does not comply with the requirement in 10 U.S.C. § 1222 that "documents announcing a decision of the board . . . convey the findings and conclusions of the board in an orderly and itemized fashion with specific attention to each issue presented by the member in regard to that member's case." But contrary to this claim, Personnel Instruction 7 requires the MAB to provide the Surgeon General with a report that includes the reasons for its decision, including the basis for its recommended disability rating. Def. App. at 38–39.

Plaintiffs also complain that—in violation of 10 U.S.C. § 1222—USPHS does not supply its commissioned officers with the services of "physical evaluation board liaison officers, to provide advice, counsel, and general information to such members on the operations of physical evaluation boards." 10 U.S.C. § 1222(b)(1)(A). This claim also lacks merit. USPHS employs MRBs and MABs in its process, not Physical Evaluation Boards ("PEBs"). Nonetheless, the USPHS DEM specifically provides that "each officer undergoing an evaluation for disability retirement or separation will be counseled" concerning processing procedures, legal rights, the effect of findings and recommendations of the MRB, retirement or severance pay after the MRB makes its findings, and potential VA benefits. Def. App. at 21. Further, neither Ms. Casiano nor Ms. Barrett contends that either of them was denied such counseling or that, in any event, the failure to provide them with the services of a counselor affected the outcome of their cases in any way.

---

[9] In their motion, Plaintiffs also argue that "HHS has, by its own regulations, stated that it will follow DoDI 1332.18." Pls.' Resp. at 10. But contrary to Plaintiffs' contention, the pertinent HHS directive (the USPHS Disability Evaluation Manual) states only that "[t]o assure uniform interpretation of the laws among the Uniformed Services, PHS has adopted the principles set forth in the DoD Directive 1332-18." Def. App. at 7. It explicitly provides that "the administrative procedures used to implement these guidelines may be at variance due to differences in PHS and DoD operational practices" and that "[w]here there is a discrepancy between the provisions of any official PHS issuance and DoD Directive 1332.18, the PHS issuance shall in all cases prevail." <u>Id.</u>

The Court finds similarly without merit Plaintiffs' claims that USPHS's procedures deny them their statutory right under 10 U.S.C. § 1214 to "a full and fair hearing" and to impartial review. Although difficult to follow, it appears that this assertion is based on the fact 1) that USPHS did not afford Plaintiffs an opportunity to submit additional evidence in response to the decisions of the MAB, before the Surgeon General made final decisions regarding their separation and 2) that USPHS did not reimburse them for the costs of legal representation and of witness travel.

But the procedures USPHS uses to adjudicate disability retirement afford commissioned officers ample opportunity to be heard and include several layers of impartial review. As explained in detail above, commissioned officers may proceed first before an MRB and then, if dissatisfied, may secure an evidentiary hearing and de novo review by the MAB. The officer may be represented by counsel at the hearing, may put on her own evidence and witnesses, and may challenge any evidence presented to the MAB. The MAB's decision is then reviewed by the Surgeon General based on the record established at the hearing. And Plaintiffs also have resort to the BCCCR should they desire an administrative remedy for errors allegedly committed by the MRB, MAB, or the Surgeon General.

Plaintiffs provide no authority in support of their claim that the "full and fair hearing" guarantee requires more, such as the subsidization of witness travel or the provision of free counsel. While DoD subsidizes the travel of witnesses under some circumstances and offers members of the military the services of counsel, such benefits are not prerequisites to a full and fair hearing. Further, at oral argument, counsel for Plaintiffs conceded that neither Plaintiff presented any witness testimony at her hearings; nor did either allege that she would have done so had reimbursement for witness travel been available. Hr'g Tr. 32:7–16. Accordingly, Plaintiffs' argument that they were denied full and fair hearings, as guaranteed by 10 U.S.C. § 1214, lacks merit.

*        *        *        *        *        *        *        *        *        *

Finally, the Court notes that it has been challenging to untangle and sort through the litany of claims Plaintiffs make in their complaint and subsequent pleadings about the inadequacy or unlawfulness of USPHS procedures. Among other things, it is often difficult to discern whether Plaintiffs' challenges are based on their argument that USPHS is required to employ procedures that mimic the DoD Disability Evaluation System, or whether Plaintiffs are attempting to identify inconsistencies between USPHS procedures and the Title 10 statutory entitlements enumerated at 42 U.S.C. § 213a(a).

Further, as noted above, to the extent that Plaintiffs are attempting to mount a facial challenge to the HHS regulations and directives (as opposed to a claim for monetary relief), this Court lacks the jurisdiction to hear it. It is therefore significant that Plaintiffs generally have not explained which, if any, of the alleged procedural defects adversely affected the outcomes of their cases.

The Court has nonetheless made its best efforts to address Plaintiffs' procedural claims and finds them without merit. It turns, accordingly, to Plaintiffs' remaining claims—that they

were wrongfully denied travel pay for travel to medical examinations and that the ratings that the MABs assigned to their disabilities were incorrect.

## B. Plaintiffs' Claims That They Were Wrongfully Denied Travel Pay

In their complaint, Plaintiffs challenge what they claim is a USPHS policy of not reimbursing the travel expenses of commissioned officers for their attendance at medical examinations or at proceedings before the MAB. Compl. ¶¶ 62–68. They contend that this policy violates a federal statute (37 U.S.C. § 452) as well as the Joint Travel Regulations (41 C.F.R. §§ 300-1 to 304-9).

Plaintiffs' contentions are without merit. USPHS has acknowledged that it is bound by 37 U.S.C. § 452 and the Joint Travel Regulations, which authorize reimbursement of travel expenses for USPHS officers who are required to travel in order to undergo physical examinations required by USPHS's DEM.[10] Officers seeking such reimbursement are required by the Federal Travel Regulations to file a claim in accordance with administrative procedures prescribed by USPHS. See 41 C.F.R. §§ 301-52.1; 301-52.6. According to the government, however, neither Plaintiff has done so. Any claims that they might have regarding reimbursement for the expenses of travelling to mandatory medical examinations are accordingly not ripe for review.

There is no merit to Plaintiffs' claim that Instruction 7 stating that "[t]here is no statutory authority which will permit DHHS to reimburse an appellant for any expenses incurred in the appeals process," is inconsistent with law or regulation. Def. App. at 34. As the Court has held, USPHS is not obligated to provide its commissioned officers with benefits that are provided by DoD regulations, but not required by statute. Further, while an appeal will be decided on the record at hand if an appellant does not attend an MAB hearing, such attendance is not mandatory. See Def. App. at 35. Because officers who attend MABs are not attending at the direction of USPHS, they are not on official travel and are not entitled to reimbursement under the Federal Travel Regulations. The Court accordingly finds without merit Plaintiffs' claims that USPHS violated applicable law or regulation by not providing such reimbursement.

## C. Plaintiffs' Allegations That USPHS Incorrectly Determined Their Disability Ratings

The remaining claims in Plaintiffs' complaint concern whether USPHS properly applied the VASRD when rating their medical conditions. Both Plaintiffs contend that it did not and that, as a result, they were denied disability retirement benefits to which they were entitled.

For the reasons set forth below, the Court agrees that the MAB failed to adequately explain why it assigned Ms. Casiano a 20% disability rating for her fibromyalgia, rather than the

---

[10] The Federal Travel Regulations define "official travel" as "[t]ravel under an official travel authorization from an employee's official station or other authorized point of departure to a temporary duty location and return from a temporary duty location, between two temporary duty locations, or relocation at the direction of a Federal agency." 41 C.F.R. § 300-3.1.

40% rating that is applicable where an officer's symptoms are "constant, or nearly so, and refractory to therapy." 38 C.F.R. § 4.71a, Diagnostic Code 5025. It will therefore remand Ms. Casiano's claim to the BCCCR for an examination of that issue, consistent with this opinion. On the other hand, the Court finds that Ms. Barrett's challenge to her 20% disability rating lacks merit. The Court will therefore grant judgment for the government as to Ms. Barrett's claims.

### 1.  Standard of Review of Military Disability Determinations

This Court applies a deferential standard of review to the decisions of military boards in disability retirement cases. That review "is limited to determining whether the . . . action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which [the complainant] has been seriously prejudiced." Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (quoting Clayton v. United States, 225 Ct. Cl. 593, 595 (1980)); see also Fisher, 402 F.3d at 1180 (Review of military disability decisions "is conducted under a deferential standard of review, essentially the standard under which administrative agency decisions are reviewed: whether the decision is arbitrary or capricious, unsupported by substantial evidence, or otherwise not in accordance with law."); Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (noting that a court "will not disturb the decision of the [] board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence").

"In determining whether a military disability evaluation board's decision was supported by substantial evidence," the Court looks to "whether the [board's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Joslyn v. United States, 110 Fed. Cl. 372, 389 (2013) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971) (superseded by statute on other grounds)). The Court thus cannot substitute its judgment for that of examining physicians, a medical evaluation board, or a physical evaluation board. Heisig, 719 F.2d at 1156.

### 2.  Ms. Casiano

Ms. Casiano contends that the MAB's decision to assign a 20% disability rating to her fibromyalgia was arbitrary and capricious. Pls.' Mot. at 24. First, she argues, the Board erred when it treated her mental health condition as a component of her fibromyalgia, rather than assigning it a separate rating. Relatedly, she complains that the Board should also have assigned separate disability ratings for each of her joints that were affected by fibromyalgia, which she asserts was the way the VA proceeded when it determined her eligibility for VA disability benefits. Id. Finally, she contends that the Board's decision was arbitrary and capricious because it failed to explain why her fibromyalgia diagnosis was not assigned a 40% disability rating, which is appropriate where the symptoms of fibromyalgia are "constant, or nearly so, and refractory to therapy." Id. (citing 38 C.F.R. § 4.71a, Diagnostic Code 5025).

### i. Failure To Assign Separate Ratings for Joint Pains and Anxiety Caused by Fibromyalgia

Ms. Casiano's first contention, as noted, is that the MAB misapplied the VASRD when it assigned her a single rating, rather than separate ratings, for the symptoms of joint pain and anxiety that were caused by her fibromyalgia. But the assignment of separate ratings would have been improper under VA regulations because it is undisputed that 1) the condition that caused Ms. Casiano's unfitness was fibromyalgia; and 2) Ms. Casiano's joint pains and her anxiety are considered symptoms of her fibromyalgia. See 38 C.F.R. § 4.71a, Diagnostic Code 5025 (including anxiety as a possible symptom of fibromyalgia).

Thus, 38 C.F.R. § 4.14, entitled "[a]voidance of pyramiding," states that "[t]he evaluation of the same disability under various diagnoses is to be avoided." As the court of appeals has explained, Section 4.14 "caution[s] against making multiple awards for the same physical impairment simply because that impairment could be labeled in different ways." Amberman v. Shinseki, 570 F.3d 1377, 1380 (Fed. Cir. 2009).

The MAB's decision to assign a single rating to Ms. Casiano's fibromyalgia is consistent with relevant precedent applying the anti-pyramiding regulation to diagnoses of fibromyalgia. In Silbaugh v. United States, for example, this court relied upon the anti-pyramiding regulations when it affirmed the Veterans Board's decision not to rate depression separately from the other symptoms of a servicemember's fibromyalgia. 107 Fed. Cl. 143, 152–53 (2012). Similarly, in Kerns v. Shinseki, the Veterans Court found no error in the Veterans Board's decision to provide a veteran with a single rating for fibromyalgia, rather than assigning separate ratings for the joint pains and for a psychological disorder. See generally Vet. App. No. 11–3509, 2012 WL 5416429 (Nov. 7, 2012) (unpublished). As the Veterans Court explained, "separately compensating [the veteran] for right knee pain that has been attributed by her doctors to her service-connected fibromyalgia would constitute pyramiding because that pain is not distinct and separate from her fibromyalgia symptoms, for which she is already being compensated." Id. at *5, *6 (observing that fibromyalgia rating "takes into account various psychiatric symptoms, such that compensating [the veteran] separately for those symptoms would constitute pyramiding"); see also Horsman v. Shinseki, Vet. App. No. 10–4224, 2012 WL 1382216, at *2 (Apr. 23, 2012) (unpublished) (finding no error in the Veterans Board's assignment of a single rating for fibromyalgia rather than rating each symptom individually).

The Court is not persuaded to depart from this precedent by Ms. Casiano's assertion that when determining her entitlement to VA benefits, the VA rated her fibromyalgia at 0% and assigned separate ratings for the pain in each of her joints as well as her anxiety disorder. See Compl. ¶ 101. For one thing, the Court has no way of assessing the significance of the VA rating decisions because they are not in the record. Moreover, and, in any event, Ms. Casiano's description of those decisions would seem to make them irreconcilable with the anti-pyramiding regulation and the precedent described above. See Silbaugh, 107 Fed. Cl. at 152 (finding no error when a disability board did not follow the actions of the VA, which had assigned the servicemember separate ratings for fibromyalgia and depression without addressing pyramiding). The Court, therefore, rejects Ms. Casiano's argument that the MAB committed error when it did not assign separate rating to her anxiety disorder, which the Board reasonably found was a symptom of her fibromyalgia.

##### ii.     Failure To Assign a 40% Rating to Fibromyalgia

Ms. Casiano's second argument is the more persuasive one. She argues that the Board's decision is arbitrary and capricious because it failed to explain why it did not assign a 40% rating for her fibromyalgia as is required where the symptoms of the illness are "constant, or nearly so, and refractory to therapy." 38 C.F.R. § 4.71a, Diagnostic Code 5025.

The Court agrees that there is ample evidence in the record that Ms. Casiano experienced symptoms of pain on a "constant" or "nearly" constant basis during the months leading up to her separation. For instance, in Ms. Casiano's written statement, which covers the period of August through December 2014, she explained that "[t]he pain and stiffness, extreme fatigue, weakness and exhaustion over the past 14 months have all been very debilitating." AR 159. She further stated that she had "lived in pain almost every day for the past 14 months and even without the extreme fatigue that has accompanied it, the pain itself has been completely exhausting to the point that on many days I have not been able to function." Id. Similarly, in a June 4, 2015 MEB Report, Dr. Matthew Graham, who examined Ms. Casiano in connection with her MAB appeal, observed that "the pain endured by Cdr. Casiano has rendered her unable to manage basic tasks due to the debilitating nature and level of pain." AR 310.

To justify a 40% rating under Diagnostic Code 5025, Ms. Casiano's symptoms would also need to be found "refractory to therapy." The term "refractory" is defined in the medical community as "resistant to treatment." Dorland's Illustrated Med. Dictionary 1617 (32d ed. 2012); Begemann v. McDonald, Vet. App. 15–0948, 2016 WL 2969401, at *6 n.1 (May 23, 2016) (quoting Dorland's) (unpublished).

The record includes significant evidence which appears to show that Ms. Casiano's symptoms were resistant to treatment. It reflects that Ms. Casiano experienced relief from pain on a reliable basis only when she was prescribed a regimen of prednisone. See AR 14 (precept for MRB stating that "her pain was responsive with only elevated doses of steroids (prednisone 20mg daily) but not to immunomodulators like hydroxychloroquine (Plaquenil)"). But the record suggests that it was not medically feasible for Ms. Casiano to take prednisone on a continuing basis (presumably because of its side effects) and that her symptoms reappeared when her medical providers required her to taper off the medication. AR 19–21 (Appendix to Precept, chronicling episodes of relief as a result of taking prednisone, followed by the return of pain after tapering off prednisone); AR 23–24, 27 (patient history set forth in report of November 5, 2014 examination, describing lack of relief from multiple medications). To the extent that prednisone could not be prescribed for use on a continuing basis, the fact that her symptoms responded to the medication is not sufficient to establish that they were not "refractory to therapy."

The Court lacks the medical expertise to determine the extent to which the other medications that Ms. Casiano was prescribed could effectively treat the pain and other symptoms that she suffered as a result of fibromyalgia. And the record contains conflicting indicators about the efficacy of the treatments she had tried. For example, a report of a November 13, 2014 examination stated that Ms. Casiano was started on Plaquenil a month and a half earlier, after she had tapered off prednisone. AR 43. The reporting physician explained that she had noticed on the preceding Friday that she did not have any pain and that she had "been good for almost 1 week." Id. Yet this relief may have been fleeting, for Ms. Casiano's statement, which was executed at

the beginning of December 2014, characterized her pain as essentially constant since the preceding August.

Similarly, while Dr. Graham's June 4, 2015 MEB Report noted "some reported improvements in symptoms with methotrexate and hydroxychloroquine," AR 311, his ultimate opinion of her prognosis was not definitive. Thus, Dr. Graham stated only that "it is possible that with continued treatment with methotrexate and hydroxychloroquine she may improve to a more functional status." AR 315.

Notwithstanding the foregoing, the government refers the Court to the MAB's observation that Ms. Casiano's "pains were resolved with corticosteroids and/or immuno-modulators (rather than exercise and anti-depressants)." AR 199. But in context, the MAB's observation does not bear on whether these medications could effectively manage her symptoms, but on the accuracy of the MRB's diagnosis of fibromyalgia. Thus, the MAB stated that it was "perplexed" by the diagnosis because Ms. Casiano had emphasized painful impairments of her hands and feet, as opposed to soft tissue "trigger points," and because it had been reported that that her pains were alleviated by medications such as corticosteroids and/or immuno-modulators (which the Court presumes would not be typically expected to provide relief to fibromyalgia sufferers). This passing statement does not provide the Court with any assurance that the MAB considered the extent to which Ms. Casiano's symptoms were manageable and therefore not "refractory to therapy."

Under RCFC 52.2(a), the Court may, on its own accord, "order the remand of appropriate matters to an administrative or executive body or official." The Court is of the opinion that Ms. Casiano's contention that her fibromyalgia was resistant to treatment should be considered in the first instance by the medical experts at the MAB. Accordingly, it will remand Ms. Casiano's claim to the BCCCR for further action consistent with this opinion.

### 3.  Ms. Barrett

Ms. Barrett's challenge to the rating that the MAB assigned to her unfitting condition is based on the theory that the MAB used the wrong diagnostic code when it made its rating decision. Section 4.71a of the VA regulations sets forth a schedule of disability ratings for impairments of the musculoskeletal system. See 38 C.F.R. § 4.71a. Within that schedule, DC 5003 prescribes ratings for degenerative arthritis. The MAB applied that diagnostic code when determining a rating for Ms. Barrett's knee impairment. Ms. Barrett contends that it was error for the Board not to instead assign her a rating under DC 5055, entitled "knee replacement (prosthetic)." Had the latter diagnostic code been selected, she contends, the MAB would have been required to assign her at least the minimum 30% disability rating applicable to each prosthetic knee.[11]

---

[11] The relevant ratings for disabilities resulting from a "knee replacement (prosthetic)" are set forth at 38 CFR § 4.71a, Diagnostic Code 5055. Under DC 5055, a rating of 60% per knee replacement is assigned where there are "chronic residuals consisting of severe painful motion or weakness in the affected extremity." Where there are "intermediate degrees of residual weakness, pain or limitation of motion," on the other hand, the knee replacement is to be rated

The determination of which diagnostic code to apply to Ms. Barrett's knee condition "concerns questions of fact—or at least questions of the application of the law to the facts." Delisle v. McDonald, 789 F.3d 1372, 1374 (Fed. Cir. 2015); see also Rivers v. Mansfield, 259 F. App'x 318, 320 (Fed. Cir. 2007) ("The decision to classify a veteran's condition under any particular diagnostic code . . . is a question of fact."); Adams v. United States, 117 Fed. Cl. 628, 655 (2014) (The Secretary of the Army's application of a military disability rating to a servicemember's condition is entitled to deference and is a fact-specific examination.); Butts v. Brown, 5 Vet. App. 532, 539 (1993) (The "selection of a DC is a question of the application of the law to the facts and not a question of law."). The Court therefore owes significant deference to the determinations of the medical professionals on the question of what code should be applied to Ms. Barrett's unfitting condition.

In this case, the MAB's decision not to categorize Ms. Barrett's unfitting condition under DC 5055 was based on the medical evidence of record and Ms. Barrett's statement. See AR 286. In fact, the MAB found that Ms. Barrett's knee replacements had improved her ability to perform the duties of her position, noting that Ms. Barrett "testified that the pains she experienced in her knees after the surgeries have improved by 50% each." Id. The MAB further explained that her medical records indicated that she "was healing very well with very good range-of-motion," and that as a result of the surgeries she was able to return to civilian work. Id. It added that when asked "about any work-limitations at her present job, [Ms. Barrett] indicated having none (which was also noted within her written personal statement to the MRB dated [July 18, 2016])." Id.

In short, the MAB concluded, "based on objective clinical data provided by [Ms. Barrett] as well as [her] sworn testimony and her documented Statement of Appeals . . . the recent right knee arthroplasty is not a disability but has instead rectified the officer's degenerative joint disease such that she is not disabled at her present employment." AR 282–83. It nonetheless found Ms. Barrett unfit for continued service on the grounds that her "overall medical status would prevent her from being deemed unconditionally deployable as a Commissioned Corps nurse (e.g. deployed in a clinical role in potentially austere environments)." Id.

The Court agrees with the government that the MAB reasonably found that Ms. Barrett's unfitting condition was degenerative disease of the knees combined with bilateral flat feet and that it properly applied the diagnostic codes for those conditions. Further, the MAB's decision was consistent with the DEM, which states that "although a medical condition is ratable according to the VASRD, it does not necessarily constitute a disability for which PHS retirement or separation disability benefits will be granted." Def. App. at 9. Accordingly, Ms. Barrett's challenge to her disability rating lacks merit and the Court will grant judgment on the administrative record for the government as to Ms. Barrett's claims.

---

"by analogy to diagnostic codes 5256, 5261, or 5262." In any case, the minimum rating under DC 5055 is 30%.

**CONCLUSION**

On the basis of the foregoing:

1.      The government's motion to dismiss is **DENIED**.

2.      Plaintiffs' motion for judgment on the administrative record as to Ms. Barrett's claims is **DENIED** and the government's motion for judgment on the administrative record as to Ms. Barrett's claims is **GRANTED**.

3.      Plaintiffs' motion for judgment on the administrative record is **GRANTED** as to Ms. Casiano's claim that the decision to assign a 20% disability rating to her fibromyalgia was arbitrary and capricious. It is **DENIED** as to Ms. Casiano's other claims. The government's motion for judgment on the administrative record as to Ms. Casiano's challenge to her disability rating is **DENIED**. It is **GRANTED** as to her other claims. Further:

      **a.**      Ms. Casiano's claim with respect to her rating is **REMANDED** to the BCCCR for additional proceedings consistent with this opinion. In particular, the BCCCR shall direct the MAB to determine whether, at the time of her separation, Ms. Casiano's symptoms were "constant, or nearly so, and refractory to therapy" within the meaning of 38 C.F.R. § 4.71a, Diagnostic Code 5025. The MAB's decision shall be based on the existing record and such additional evidence as it deems necessary to address the issue before it.

      **b.**      The remand proceedings shall be completed within 120 days of the date of this Order. The Court **STAYS** proceedings in the instant case during that time.

      **c.**      In accordance with RCFC 52.2(b)(1)(D), within 45 days of the date of this Order, and every 45 days thereafter, the government shall file a status report indicating the status of the proceedings before the BCCCR.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan

ELAINE D. KAPLAN

Judge